UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTIAN HORNELAND,

       Plaintiff,

v.                       Case No. 8:15-cv-1703-T-33TGW

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

       Defendant.

_____/

**ORDER**

This matter comes before the Court upon consideration of Plaintiff Kristian Horneland's Motion for Summary Judgment on Count II of the Complaint (Doc. # 30), filed on June 16, 2016. Also before the Court is Defendant United of Omaha Life Insurance Company's Motion for Summary Judgment as to Count II (Doc. # 27), filed on June 16, 2016. Horneland filed his response to Omaha's Motion on June 30, 2016. (Doc. # 31). And Omaha filed its response to Horneland's Motion on July 15, 2016. (Doc. # 34). Omaha filed its reply on July 25, 2016. (Doc. # 35). While Horneland filed a reply on August 11, 2016, (Doc. # 36), it was filed well beyond the deadline and without leave of Court to file out of time. The Motions are now ripe for review, and as explained more fully below, the Court denies Horneland's Motion and grants Omaha's Motion.

## I.   <u>Background</u>

Horneland began his employment with Thorntons, Inc., a nonparty to this action, as a real estate manager on March 12, 2012. (Doc. # 27-4). Thorntons held a group insurance plan, which included a provision for long-term disability benefits, issued by Omaha. (Doc. # 27-1). And under that plan, Horneland became eligible to receive benefits on March 13, 2013. (Doc. ## 27-1 at 21; 27-4).

The plan issued by Omaha states, in pertinent part:

**LONG-TERM DISABILITY BENEFITS**

**<u>Benefits</u>**

If, while insured under this provision, You become Disabled due to Injury or Sickness, We will pay the Monthly Benefit shown in the Schedule. Benefits will begin after You satisfy the Elimination Period shown in the Schedule.

**<u>Pre-existing Conditions</u>**

We will not provide benefits for Disability:
    (a) caused by, contributed to by, or resulting from a Pre-existing Condition; and
    (b) which begins in the first 12 months after You are continuously insured under this Policy.

A **Pre-existing Condition** means any Injury or Sickness for which You received medical treatment, advice or consultation, care or services including diagnostic measures, or had drugs or medicines prescribed or taken in the 3 months prior to the day You become insured under this Policy.

. . . .

**Disability and Disabled** means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

> (a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
> (b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 36 months, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

. . . .

**Injury** means an accidental bodily injury which is the direct result of a sudden, unexpected and unintended external force or element, such as a blow or fall, that requires treatment by a Physician. It must be independent of Sickness or any other cause, including, but not limited to, complications from medical care. Disability due to such injury must begin while You are insured under the Policy. Injury does not include elective or cosmetic surgery or procedures, or complications resulting therefrom.

**Material Duties** means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than 40 hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.

. . . .

> **Sickness** means a disease, disorder or condition, including pregnancy, for which you are under the care of a Physician. Disability must begin while you are insured under the Policy. Sickness does not include elective or cosmetic surgery or procedures, or complications resulting therefrom.

(Doc. # 27-1 at 25, 37-38, 40).

On September 25, 2013, Horneland filed a short-term disability claim form with Omaha, which listed the nature of his illness as "severe back pain & muscle spasms." (Doc. # 27-3). The short-term disability claim form also indicated that Horneland's pain "started in February [of 2013,] & got progressively worse." (Id.). Horneland indicated on the same form that his disability began on July 1, 2013. (Id.).

Charles Gelia, M.D., submitted an attending physician's statement on September 18, 2013, in connection with Horneland's application for disability. (Doc. # 27-5). On the physician's statement, Gelia listed the diagnosis as "sciatica" and "back pain/spasm." (Id. at 1). Gelia further indicated that Horneland's symptoms first appeared on October 16, 1998, from a fall. (Id.). The fall in October of 1998, resulted in fractures to Horneland's spinous processes of the T6, T7, and T8 vertebrae. (Doc. # 27-12 at 1).

Because Horneland filed his claim within one year of becoming insured, Omaha conducted a review to determine whether the plan's pre-existing condition exclusion applied. See (Doc. # 27-1 at 25). The look-back period ran from December 12, 2012, through March 11, 2013. (Id.) (defining look-back period as "3 months prior to the day You become insured under this Policy").

On August 29, 2012, albeit outside the look-back period, Horneland treated with Gelia to "have [his] back checked," and was prescribed Vicodin and Voltaren Gel. (Doc. # 27-6). During the look-back period proper, Horneland treated with Gelia on January 7, 2013, January 31, 2013, and March 4, 2013. (Doc. ## 27-8, 27-9, 27-10). Horneland also had several prescriptions filled during the look-back period, specifically prescriptions for Tramadol, Hydrocodone, and Volatren. (Doc. # 27-7 at 2-4).

Horneland continued to seek medical treatment for his back pain after the look-back period. On August 23, 2013, Horneland treated with Sunil J. Panchal, M.D., at the National Institute of Pain. (Doc. # 27-11). Panchal's new consultation note indicated Horneland presented with "chronic mid back pain . . . involv[ing] . . . the lower thoracic and upper lumbar facet joints." (Id. at 1).

5

Then on September 13, 2013, Horneland treated with Brody L. Henkel, M.D., at Neurological Specialties, P.A. (Doc. # 27-12). Henkel noted that Horneland's chief complaint was "[m]id to lower back pain." (Id. at 1). Henkel further noted that he reviewed MRI images of Horneland's lumbar spine; that Horneland's gait and station were normal; and that Horneland's lumbar spine presented "[n]o erythema, ecchymosis, or edema. No tenderness of spine or SI joints. [There was also] [f]ull, painless range of motion of the lumbar spine." (Id. at 1-2). Henkel assessed Horneland as suffering from pain in the thoracic spine and recommended an MRI of the thoracic spine. (Id. at 3).

Horneland underwent an MRI of his thoracic spine on December 17, 2013. (Doc. # 27-15). The MRI report stated the findings as, "[t]he study show[ed] normal alignment. No compression fractures. No focal protrusions of concern [were] seen. Thoracic cord also appear[ed] normal. Foramima [were] widely patent." (Id.). Two days later, on December 19, 2013, Horneland followed up with Henkel. (Doc. # 27-16). Henkel's report from that visit indicated no muscle spasms in, and normal range of motion of, the lumbar spine. (Id. at 2). The report also stated Henkel's impression as, "MRI thoracic spine was normal and I cannot identify an underlying

6

Neurological etiology of the patient's reported mid-back pain." (Id. at 4).

As part of its review of Horneland's claim, Omaha had an independent medical evaluation conducted by David P. Kalin, M.D., M.P.H., on February 4, 2014. (Doc. # 27-18). After reviewing Horneland's pertinent medical records from October 16, 1998, through December 16, 2013, Kalin reported his assessment as, among others, "[e]xacerbation/[a]ggravation [of] chronic thoracolumbar musculoskeletal ligamentous strain with minimal annular bulging L4-5, L5-S1." (Id. at 3-5). Kalin further opined that Horneland's "present musculoskeletal [condition] was initially caused by a slip/fall injury sustained during 1998, with fractures of the spinous processes of T6-7-8." (Id. at 6). According to Kalin, "[w]ithin a reasonable degree of medical probability[,] the examinee's employee obligations . . . exacerbated and/or aggravated his preexisting condition." (Id.).

Horneland continued to seek medical attention for his back pain and, on February 12, 2014, treated with Steven Andrew Barna at Florida Orthopaedic Institute. (Doc. # 27-19). Thereafter, by a letter dated July 24, 2014, Gelia stated he had diagnosed Horneland as suffering from pain in the thoracic spine, sciatica, and hypermobility syndrome. (Doc.

7

# 28-1 at 1). Gelia further stated it was his opinion that, within a reasonable degree of medical probability, Horneland's conditions "were caused or contributed to by" Horneland's job duties. (Id.).

Omaha denied Horneland's long-term disability application on February 26, 2014. (Doc. # 28-3). In its letter-of-denial, Omaha reviewed the plan's pertinent language and summarized Horneland's medical history. Omaha provided its reason for denial as:

> [t]he medical records received for the pre-existing time frame of December 12, 2012 to March 12, 2013 were handwritten and mostly illegible and the diagnosis of "B.A." is not clear. However, the information on file indicates the onset of the reported symptoms of back pain was in January of 2013. In addition you were consistently being prescribed both Vicodin and Tramadol before during and after the pre-existing time frame, indicating you were actively receiving treatment for the reported back pain during the pre-existing time frame.
>
> In summary, the documentation on file indicates you received treatment for back pain and muscle spasms during the pre-existing time frame for the above reference[d] policy. In addition, the above noted restrictions and limitations in place from September 14, 2013 going forward would not preclude you from performing the Material Duties of your Regular Occupation as a Real Estate Manager. Therefore your disabling conditions are considered pre-existing, you would not have any current restrictions or limitations, no benefits are payable and your claim has been denied[.]

(Doc. # 28-3 at 5). Horneland timely appealed Omaha's decision on August 22, 2014. (Doc. # 28-4).

Thereafter, in February of 2015, Horneland underwent testing at the Tampa Pain Relief Center with Robert Guirguis, D.O. (Doc. # 28-5). Based on the tests conducted, Guirguis opined "[t]here [was] electrodiagnostic evidence consistent with lumbar radiculopathy affecting the bilateral L5 nerve roots." (Id.).

In addition, Gelia submitted a supplemental statement to Omaha on behalf of Horneland during the appeal. (Doc. # 28-7). In his supplemental statement, Gelia stated, it was "now apparent that the condition which disables Mr. Horneland is in the lumbar region and includes sciatica. . . . In layman's terms, this MRI [dated February 11, 2015,] does not support a thoracic-based disability." (Id. at ¶ 5). Gelia's supplemental letter also indicated that Horneland's office visits in January of 2013 were for annual checkups and to review blood tests as a part thereof, while the March 4, 2013, office visit was for the purpose of refilling several prescriptions for pain medication. (Id. at ¶¶ 3-4).

Also as a part of the appellate review conducted by Omaha, an additional independent medical evaluation was conducted by Kalin. (Doc. # 28-8). Kalin's addendum to his

prior independent medical evaluation provides a summary of Horneland's medical history and states:

> [w]ithin a reasonable degree of medical certainty the work-related obligation requiring long periods of prolonged driving has aggravated the examinee's preexisting condition due to fractures of the spinous processes of T6, 7, 8, slip and fall injury 1998, which were asymptomatic prior to the aggravation of condition which developed during 09/12.
>
> Within a reasonable degree of medical certainty prolonged sitting and driving caused additional compression extending from the thoracic to the lumbar spine, resulting in further decompensation of the musculoskeletal integrity in the mid/lower back, thereby affecting neurologic function in the lower extremities as manifested by symptoms of chronic right sciatica and electro-diagnostic evidence of bilateral lumbar radiculopathy, neurologic etiologies emanating from the lumbosacral spine and consistent with reactive muscle spasms and localized scoliosis, lumbar and sacral subluxations, and underlying degenerative changes, protrusion/herniation T11-12 disk and annular bulging of L4-L5, L5-S1 disks, as evidenced in MRI.

(Id. at 14).

Furthermore, Omaha referred the following to Nancy L. Heimonen, M.D.: "[p]lease identify symptom(s) or condition(s) treated during the pre-existing period. Additionally would there be any correlation between the treated conditions and any claimed impairing diagnoses?" (Doc. # 28-9 at 2). Based on her review, Heimonen opined "there [was] reasonable medical evidence to conclude that the complaints that

10

apparently precluded work capacity as of 8/2/13 ('B/A' apparently= backache) [were] the same complaint that was evaluated and treated with medications by Dr. Gelia during the period in question of 12/12/12-3/11/13." (Id. at 4). Heimonen continued:

> [t]he currently available specialty records [did] not support the existence of back and lower extremity complaints that would be characterized as sciatica . . . and [did] not support the existence of a neurological deficit that would be characterized as lumbar radiculopathy around the time of the insured's work cessation. Thus, although there may (or may not) be evidence of a new onset lumbar radiculopathy to explain the insured's complaints in 2015, there [was] insufficient medical and physical exam evidence to support that either lumbar radiculopathy or sciatica existed in association with the insured's back pain complaints at the time of work cessation. With a reasonable degree of medical certainty, the complaints that were the basis of support for the insured's inability to perform his occupational duties beyond 8/2/13 [were] the same complaints for which the insured sought evaluation and treatment during the period in question of 12/12/12-3/11/13.

(Id. at 5).

Omaha affirmed the denial of long-term disability benefits on July 7, 2015. (Doc. # 28-10). In its letter-of-denial, Omaha summarized the medical history of Horneland and the evidence reviewed. Ultimately, Omaha concluded the denial should be affirmed because there was "a reasonable degree of medical certainty that the complaints that were the basis of

support for Mr. Horneland's inability to perform . . . [were] the same complaints for which he sought evaluation and treatment during the Pre-existing Condition exclusionary period . . . ." (Id. at 5).

Subsequent to Omaha's affirmance, Horneland filed suit in this Court on July 21, 2015. (Doc. # 1). The Complaint brought two counts under ERISA; namely, recovery of short-term disability benefits (Count I) and recovery of long-term disability benefits (Count II). (Id.). After this action was instituted, the parties jointly notified the Court that Omaha had tendered all short-term disability benefits Horneland sought to recover in Count I. (Doc. # 25). The parties also moved the Court to enter judgment in favor of Omaha as to Count I, but to withhold entry of judgment thereon until Count II was resolved. (Id.). The Court granted the motion. (Doc. # 26). Thereafter, the parties filed the currently pending Motions, which are ripe for review.

## II.   Standard

"A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan . . . ." 29 U.S.C. § 1132(a)(1)(B). In other words, "ERISA 'permits a person denied benefits under an employee benefit plan to challenge that denial in federal

court.'" Acree v. Hartford Life & Accident Ins. Co., 917 F. Supp. 2d 1296, 1304 (M.D. Ga. 2013) (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008)).

A person challenging the denial of disability benefits "bears the burden to prove that [he or] she is disabled." Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1247 (11th Cir. 2008) (citing Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998)). "But, if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." Burden v. Reliastar Life Ins. Co., No. 1:12-cv-04392-WSD, 2014 WL 26090, at *5 (N.D. Ga. Jan. 2, 2014) (quoting Horton, 141 F.3d at 1040).

"[I]n an ERISA benefit denial case . . ., the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record complied before the plan fiduciary." Curran v. Kemper Nat'l Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002)) (first alteration in original). And, when, as here, the parties utilize the procedural vehicle of cross-motions for summary judgment in

an action challenging the denial of benefits, "[t]he fortuity that the parties . . . [have done so] to bring the case forward for judicial review of the plan administrator's determination cannot be permitted either to dilute the teachings of *Firestone* [*Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989),] or to undercut the standard of review that the *Firestone* Court decreed . . . ." Leahy, 315 F.3d at 18. "Accordingly, [w]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Ramdeen v. Prudential Ins. Co. of Am., --- F. Supp. 3d ---, No. 6:15-cv-139-Orl-28TBS, 2016 WL 715791, at *4 (M.D. Fla. Feb. 19, 2016) (quoting Crume v. Metro. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006)) (internal quotation marks omitted); see also Hopp v. Aetna Life Ins. Co., 3 F. Supp. 3d 1335, 1339 (M.D. Fla. 2014); Providence v. Hartford Life & Accident Ins. Co., 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005).

Indeed, the Eleventh Circuit has previously rejected a claimant-cum-appellant's argument that a district court erred in granting summary judgment in spite of factual disputes

about whether the claimant was disabled. Glazer, 524 F.3d at 1246-47. The court noted that, in reviewing "an ERISA benefits denial under an arbitrary and capricious standard . . .[,] the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Id. at 1246. The court continued by expounding its "well-defined series of steps" used to review a denial of benefits under ERISA, Id. at 1246-47, which is laid out more fully below. After review, the court concluded——even though a dispute of fact existed as to whether the claimant was disabled——the district court did not err in granting summary judgment after applying the analytical framework for ERISA denial of benefits cases because there was no dispute about what the record contained when the administrator made its decision. Id. at 1247.

As mentioned, the Eleventh Circuit has "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions." Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011) (citation omitted). That multi-step framework has six steps:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the

administrator's decision); if it is not, then end
the inquiry and affirm the decision.
(2) If the administrator's decision in fact is "*de
novo* wrong," then determine whether he was vested
with discretion in reviewing claims; if not, end
judicial inquiry and reverse the decision.
(3) If the administrator's decision is "*de novo*
wrong" and he was vested with discretion in
reviewing claims, then determine whether
"reasonable" grounds supported it (hence, review
his decision under the more deferential arbitrary
and capricious standard).
(4) If no reasonable grounds exist, then end the
inquiry and reverse the administrator's decision;
if reasonable grounds do exist, then determine if
he operated under a conflict of interest.
(5) If there is no conflict, then end the inquiry
and affirm the decision.
(6) If there is a conflict, the conflict should
merely be a factor for the court to take into
account when determining whether an administrator's
decision was arbitrary and capricious.

Sobh v. Hartford Life & Accident Ins. Co., --- Fed. Appx. --
-, No. 15-15586, 2016 WL 3564380, at *4-5 (11th Cir. July 1,

2016) (quoting Blankenship, 644 F.3d at 1355). "At each step,

the court makes a determination that results in either the

progression to the next step or the end of the inquiry."

Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227,

1232 (11th Cir. 2006).

With respect to the first step, "[a] decision is 'wrong'

if, after a review of the decision of the administrator from

a *de novo* perspective, 'the court disagrees with the

administrator's decision.'" Glazer, 524 F.3d at 1246

(citation omitted). "The court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." Id.; see also Nolley v. Bellsouth Long Term Disability Plan For Non-Salaried Emps., 610 Fed. Appx. 841, 843 (11th Cir. 2015) ("In tackling the first prong of the six-part test, we review the administrator's decision for correctness, based upon the evidence before the administrator at the time of its benefits decision" (citing Melech v. Life Ins. Co. of N. Am., 739 F.3d 663, 672 (11th Cir. 2014))); Blankenship, 644 F.3d at 1354 ("Review of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision."); Ruple v. Hartford Life & Accident Ins. Co., 340 Fed. Appx. 604, 612 (11th Cir. 2009) ("Our law is clear . . . that even under the first step of the [Williams] analysis, where the court determines whether the administrator was wrong under a 'de novo' standard, '[w]e are limited to the record that was before [the administrator] when it made its decision.'") (citations omitted) (second alteration in original). "If the court determines that the plan administrator was right, the analysis ends and the

decision is affirmed." Glazer, 524 F.3d at 1246-47 (citation omitted).

### III. **Analysis**

Although the parties devote a sizeable portion of the briefs to the methodology utilized by Omaha in affirming the denial of long-term disability benefits, such briefing does not further this Court's analysis. To be sure, at the first step, the Court conducts a de novo review in order to determine whether it agrees with the decision of the plan administrator. "Thus, no deference is afforded the administrator's decision. Rather, the Court is to 'stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously.'" Bradshaw v. Reliance Standard Life Ins. Co., No. 8:15-cv-988-T-30TGW, 2016 WL 580122, at *6 (M.D. Fla. Jan. 25, 2016) (citation omitted).

Having started its review of the record before the administrator at the time the decision was made, see, e.g., Glazer, 524 F.3d at 1246, "from scratch," the Court agrees with Omaha's decision that the plan's pre-existing condition provision warranted the denial of long-term disability benefits. When Gelia filed his physician's statement on September 18, 2013, he listed the diagnosis as "sciatica" and

18

"back pain/spasm," and indicated that Horneland's symptoms first appeared on October 16, 1998, from a fall. (Doc. # 27-5). The fall in October of 1998, resulted in fractures to Horneland's spinous processes of the T6, T7, and T8 vertebrae. (Doc. # 27-12 at 1). The look-back period ran from December 12, 2012, through March 11, 2013. (Doc. # 27-1 at 25). And the record demonstrates that Horneland sought treatment for back pain before, during, and after the look-back period. Specifically, Horneland treated with Gelia on August 29, 2012, to "have [his] back checked," and was prescribed Vicodin and Voltaren Gel. (Doc. # 27-6). Horneland again treated with Gelia on March 4, 2013, to have several prescriptions refilled for his pain. (Doc. # 27-10). Relatedly, Horneland had several prescriptions filled during the look-back period, specifically prescriptions for Tramadol, Hydrocodone, and Volatren. (Doc. # 27-7 at 2-4).

An independent medical exam by Kalin shows Horneland was assessed to suffer from "[e]xacerbation/[a]ggravation [of] chronic thoracolumbar musculoskeletal ligamentous strain with minimal annular bulging L4-5, L5-S1." (Doc. # 27-18 at 5). In that same independent medical exam, Kalin opined that Horneland's "present musculoskeletal [condition] was initially caused by a slip/fall injury sustained during 1998,

19

with fractures of the spinous processes of T6-7-8." (Id. at 6). And, during the appeal when Kalin conducted a supplemental review, Kalin similarly opined, "[w]ithin a reasonable degree of medical certainty[,] the work-related obligation requiring long periods of prolonged driving . . . aggravated the examinee's preexisting condition due to fractures of the spinous processes of T6, 7, 8, slip and fall injury 1998, which were asymptomatic prior to the aggravation of condition which developed during 09/12." (Doc. # 28-8 at 14). Kalin also explained:

> [w]ithin a reasonable degree of medical certainty[,] prolonged sitting and driving caused additional compression extending from the thoracic to the lumbar spine, resulting in further decompensation of the musculoskeletal integrity in the mid/lower back, thereby affecting neurologic function in the lower extremities as manifested by symptoms of chronic right sciatica and electro-diagnostic evidence of bilateral lumbar radiculopathy, neurologic etiologies emanating from the lumbosacral spine and consistent with reactive muscle spasms and localized scoliosis, lumbar and sacral subluxations, and underlying degenerative changes, protrusion/herniation T11-12 disk and annular bulging of L4-L5, L5-S1 disks, as evidenced in MRI.

(Id.).

Heimonen, a doctor to whom Omaha referred the appeal, stated after reviewing the record that "there [was] reasonable medical evidence to conclude that the complaints

that apparently precluded work capacity as of 8/2/13 ('B/A' apparently= backache) [were] the same complaint that was evaluated and treated with medications by Dr. Gelia during the period in question of 12/12/12-3/11/13." (Doc. # 28-9 at 4). Heimonen continued:

> [t]he currently available specialty records [did] not support the existence of back and lower extremity complaints that would be characterized as sciatica . . . and [did] not support the existence of a neurological deficit that would be characterized as lumbar radiculopathy around the time of the insured's work cessation. Thus, although there may (or may not) be evidence of a new onset lumbar radiculopathy to explain the insured's complaints in 2015, there [was] insufficient medical and physical exam evidence to support that either lumbar radiculopathy or sciatica existed in association with the insured's back pain complaints at the time of work cessation. With a reasonable degree of medical certainty, the complaints that were the basis of support for the insured's inability to perform his occupational duties beyond 8/2/13 [were] the same complaints for which the insured sought evaluation and treatment during the period in question of 12/12/12-3/11/13.

(Id. at 5).

In sum, Horneland treated with his primary care physician before, during, and after the look-back period for back pain, and had prescriptions for pain medicine filled during the look-back period. Furthermore, two doctors opined that, within a reasonable degree of medical certainty, Horenland's complaints that formed the basis for him filing

a claim of disability were the same as those for which Horneland sought treatment during the look-back period. On this record, the Court cannot say that Omaha's decision was "wrong." Thus, because "the court determines that the plan administrator was right, the analysis ends and the decision is affirmed." Glazer, 524 F.3d at 1246-47 (citation omitted).

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiff Kristian Horneland's Motion for Summary Judgment on Count II of the Complaint (Doc. # 30) is **DENIED.**

(2) Defendant United of Omaha Life Insurance Company's Motion for Summary Judgment as to Count II (Doc. # 27) is **GRANTED.**

(3) The Clerk is directed to enter judgment in favor of Defendant United of Omaha Life Insurance Company as to Count I and Count II of the Complaint. Thereafter, the Clerk shall **CLOSE THIS CASE.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 23rd day of August, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE