UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTIAN HORNELAND,

          Plaintiff,

v.                          Case No. 8:15-cv-1703-T-33TGW

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

          Defendant.

_____/

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

This cause comes before the Court pursuant to a bench trial held on March 26, 2019. The parties filed their proposed findings of fact and conclusions of law on July 3, 2019. (Doc. ## 85, 86). Having considered the evidence and applicable law, the Court grants judgment in favor of Defendant United of Omaha Life Insurance Company and against Plaintiff Kristian Horneland.

## I.    **<u>Background and Procedural History</u>**

Horneland initiated this ERISA action against United of Omaha seeking to recover short- and long-term disability benefits under a policy he received from his employer. (Doc. # 1). The policy has a pre-existing condition exclusion which provides:

> We will not provide benefits for Disability:
>
> (a) caused by, contributed to by, or resulting from a Pre-existing Condition; and
>
> (b) which begins in the first 12 months after You are continuously insured under this Policy.

(Doc. # 74-2 at 24). The policy defines "pre-existing condition" as "any Injury or Sickness for which You received medical treatment, advice or consultation, care or services including diagnostic measures, or had drugs or medicines prescribed or taken in the 3 months prior to the day You become insured under this Policy." (Id.). Horneland's treatment during that 3-month "look-back period" lies at the core of this case.

The parties resolved the short-term disability claim prior to trial and agreed to a stipulated judgment in United of Omaha's favor on that count. (Doc. # 25). Subsequently, the parties filed cross-motions for summary judgment solely on the issue of whether the long-term disability policy's pre-existing condition exclusion applied. (Doc. # 37).

The Court granted summary judgment in favor of United of Omaha, finding that the pre-existing condition exclusion barred coverage. (Id.). The Court found that the physician

statement of Horneland's primary care physician, Dr. Charles Gelia, listed his diagnosis as "sciatica" and "back pain/spasm" and indicated that Horneland's symptoms first appeared on October 16, 1998, from a fall which resulted in fractures to Horneland's spinous processes of the T6, T7, and T8 vertebrae. (<u>Id.</u> at 18-19). Following the fall, Horneland continuously sought treatment for his back pain before, during, and after the look-back period. (<u>Id.</u> at 19).

Because the policy had a look-back period that ran from December 12, 2012, through March 11, 2013, treatment for the claimed disabling condition during this period would preclude coverage. (<u>Id.</u>). The Court found that Horneland went to Dr. Gelia on August 29, 2012, to "have his back checked" and was prescribed pain medication. Horneland went back to Dr. Gelia on March 4, 2013, to refill several prescriptions for his back pain. (<u>Id.</u>).

Dr. David Kalin conducted an independent medical examination of Horneland which showed that Horneland suffered from "[e]xacerbation/[a]ggravation [of] chronic thoracolumbar musculoskeletal ligamentous strain with minimal annular bulging L4-5, L5-S1." (<u>Id.</u>). Dr. Nancy L. Heimonen, a doctor to whom United of Omaha referred Horneland's appeal,

3

found that "there [was] reasonable medical evidence to conclude that the complaints that apparently precluded work capacity as of 8/2/13 ('B/A' apparently = backache) [were] the same complaint that was evaluated and treated with medications by Dr. Gelia during the period in question of 12/12/12-3/11/13." (Id. at 20-21).

Accordingly, the Court concluded that the complaints that formed the basis of Horneland's disability claim were the same as those for which Horneland sought treatment during the look-back period. (Id. at 21-22). As a result, the Court found that United of Omaha correctly denied coverage for Horneland's claim and granted summary judgment in its favor.

Horneland subsequently appealed to the United States Court of Appeals for the Eleventh Circuit. (Doc. # 51). The Eleventh Circuit affirmed the denial of Horneland's summary judgment motion but reversed the summary judgment granted in United of Omaha's favor and remanded the case for further proceedings. See Horneland v. United of Omaha Ins. Co., 717 F. App'x 846, 847 (11th Cir. 2017).

The Eleventh Circuit held that there were inconsistencies in the evidence that precluded entry of summary judgment. Id. at 856. The Eleventh Circuit directed

4

this Court to address three factual issues it deemed essential to the determination of whether the pre-existing condition exclusion applied to Horneland's claim: (1) what Horneland's disability is, (2) what Horneland's pre-existing condition is, and (3) what, if any, relationship there is between Horneland's pre-existing condition and his disability. Id.

The Eleventh Circuit further explained that, to prove his claim, Horneland must "thread the eye of this needle" by showing "(1) that he was disabled by a lumbar condition (2) that arose before his insurance policy ended and (3) that was not caused by an earlier thoracic injury that manifested itself during the look-back period." Id. at 857.

Following remand, the parties took additional depositions to answer these questions. See (Doc. # 72). The case proceeded to a bench trial before this Court on March 26, 2019. Horneland testified on his own behalf and presented the testimony of his expert witness, Dr. John Merritt. The parties also submitted joint exhibits, including the Administrative Record, as well as deposition transcripts (and attached exhibits) of Dr. Merritt, Dr. Gelia, Dr. Kalin, and Dr. Robert Guirguis.

5

## II.   <u>Findings of Fact</u>

Horneland's back problems began on October 16, 1998, when he suffered fractures of the spinal processes in the thoracic region in the T6, T7, and T8 vertebrae in a slip-and-fall accident. (Trial Tr. at 21:18-25, 49:20-24). At the time, he lived in Minnesota and worked as a server. (<u>Id.</u> at 21:18-20).

In February of 1999, Horneland sought treatment for upper and lower back pain from Dr. Ensor Transfeldt. (Doc. # 74-55 at 35-37). This "unbearable pain" ranged from his upper back through his lower back to his sacrum. (Trial Tr. at 50:9 -51:6; Doc. # 74-55 at 37-38). Five months later, Horneland continued to have "midback pain" and "paraspinal issues from the midthoracic down to the lower lumbar spine area." (Doc. # 74-55 at 13).

Horneland moved to Florida in 2000. (Trial Tr. at 23:17-18). Not long thereafter, he began to suffer spasms in his thoracic spine and participated in inpatient rehabilitation. (<u>Id.</u> at 23:19-24:8). Horneland then lived largely pain-free for seven to ten years. (<u>Id.</u> at 24:10-12).

In 2009, Horneland began treatment with Dr. Gelia for back pain in his lumbar and thoracic areas. (Doc. # 74-46 at

6

94; Gelia Dep. 9:18-20, 10:18-11:2, Doc. # 72-2). From 2009 through 2013, Dr. Gelia prescribed Horneland a variety of pain medications, including Tramadol, Propoxyphene, Darvocet, Hydrocodone, Vicodin, and Ultram, for his back pain. (Trial Tr. at 55:9-56:2; Gelia Dep. 18:10-25, Doc. # 72-2). Dr. Gelia stated in his deposition that those medications were prescribed for Horneland's chief complaint, which was chronic low back pain. (Gelia Dep. 18:21-19:1, 20:18-21, 21:3-4, Doc. # 72-2).

On March 12, 2012, Horneland began working as a real estate manager for Thorntons, a convenience store company in Florida. (Trial Tr. at 62:18-24). As part of his employment, he enrolled for disability coverage under the policy sponsored by Thorntons and insured by United of Omaha. Horneland became eligible for coverage under the policy on March 12, 2013. (Doc. # 74-2 at 21). The look-back period ran from December 12, 2012, through March 11, 2013. (Doc. # 74-2 at 24)

As a real estate manager, Horneland sourced new locations for Thorntons. (Trial Tr. at 26:6-14). Initially, he drove to various sites for a couple of hours a day, a couple of times per week. (Id. at 27:12-19). But around

December 2012 or January 2013, Horneland's counterpart was terminated. As a result, Horneland's driving responsibilities increased dramatically — up to ten to sixteen hours per day, five days a week. (Id. at 28:12-29:15). Horneland testified at trial that this increase in driving and the long periods of sitting that came with it re-aggravated his chronic back pain. (Id. at 59:4-9).

On March 4, 2013, Horneland saw Dr. Gelia because "things started heating up" and he wanted a refill of Vicodin and Tramadol. (Gelia Dep. 30:10-13, Doc. # 72-2). At the time, Horneland was experiencing both thoracic and lumbar pain, which Dr. Gelia diagnosed at that time as a "backache." (Id. at 31:23-32:2, 86:22-87:5). For the "backache," Dr. Gelia prescribed steroids and a muscle relaxer. (Id. at 32:22-25).

Throughout the course of treatment, Dr. Gelia diagnosed Horneland with "backache," "lumbar backache," and "chronic backache." (Id. at 39:9-14, 42:12-15, 48:14-16). According to Dr. Gelia, his use of the term "backache" translated in medical parlance to diagnoses of "lumbosacral sprain/strain, lumbago, lumbar disc disease, [and] degenerative joint disease," which are "just synonyms for the same thing." (Id. at 41:16-42:11).

8

The Court notes, however, that Dr. Gelia previously provided contradictory evidence about the nature of Horneland's March 4, 2013, visit. In a written statement dated March 23, 2015, Dr. Gelia stated that the March 4, 2013, visit was for "upper mid-back" pain and that "there were no lumbar-related complaints or findings on this date." (Doc. # 74-7). But when confronted with this statement during his deposition, Dr. Gelia vacillated, first claiming that he did not remember the statement, then speculating that he may have made an error. (Gelia Dep. 85:16-18, 87:13-14, 94:13-15, Doc. # 72-2). Ultimately, though, he deferred to the written statement, assuming that "the situation was fresh in [his] mind" when he prepared it. (Id. at 97:10-12).

The Court, however, credits Dr. Gelia's deposition testimony over the conflicting claims in the written statement. While the written statement contains unsworn, perfunctory factual assertions unsupported by citation to any of Horneland's medical records, Dr. Gelia's deposition testimony was more nuanced, given under oath, and based largely on Horneland's treatment records. Additionally, Dr. Gelia's deposition testimony is consistent with much of the medical evidence in this case, which further leads the Court

to believe that it is the more accurate account of Horneland's March 4, 2013, visit.

Furthermore, there is evidence showing that Horneland reported to other medical providers that he had increasing lumbar and mid and lower back pain from 2012 to January 2013. (Doc. # 74-49 at 8; Doc. # 74-57 at 32; Doc. # 77-2 at 45). Horneland also stated in his short-term disability claim form that his "severe back pain & muscle spasms" began in February 2013. (Doc. # 74-35).

Horneland saw Dr. Gelia several times for his lower back pain in the subsequent months. (Gelia Dep. 34:4-9, 37:13-23, 28:9-13, 39:17-22, Doc. # 72-2). Around the end of June or beginning of July 2013, Dr. Gelia placed Horneland on bedrest. (Trial Tr. at 34:21-35:15). Horneland's last day of work was July 1, 2013. (Id. at 69:20-22). Horneland later reported to Dr. Guirguis that he was experiencing mid and low back pain at that time. (Guirguis Dep. 11:17-24, Doc. # 72-3).

Horneland's counsel retained Dr. Kalin for an independent medical examination. (Kalin Dep. 7:11-16, Doc. # 72-4). Dr. Kalin examined Horneland on February 4, 2014. (Id. at 12:8-24). In his report, Dr. Kalin noted that Horneland's chief complaint was "[p]ain mid/lower back." (Doc. # 74-54 at

12). Dr. Kalin found that the initiating factor, the slip-and-fall in 1998, was exacerbated by Horneland's increased driving for extended periods. (Kalin Dep. 34:17-22, 37:9-22, Doc. # 72-4; Doc. # 74-54 at 17). Dr. Kalin diagnosed Horneland with "exacerbation/aggravation [of] chronic thoracolumbar musculoskeletal ligamentous strain with minimal annular bulging L4-5, L5-S1." (Doc. # 74-54 at 16; Kalin Dep. 21:7-10, Doc. # 72-4).

On March 27, 2015, Dr. Kalin provided an addendum to his initial report. (Doc. # 74-11). Dr. Kalin explained that Horneland had undergone additional treatment but did not seem to be getting any better. (Kalin Dep. 40:6-10, Doc. # 72-4). Horneland also had additional MRIs of his lumbar and thoracic regions performed subsequent to Dr. Kalin's initial report. (Id. at 52:19-22).

Dr. Kalin tweaked his diagnosis in the addendum. This time, he found that Horneland suffered from "[a]ggravation [of] chronic thoracolumbar musculoskeletal ligamentous strain with mild central protrusion T1-12 without canal stenosis or cord compression (02/11/15, MRI), mild osseous degenerative change with mild scoliosis (01/27/15, MRI), [and] minimal annular bulging L4-5, L5-S1 (09/12/13, MRI)." (Doc. # 74-11

11

at 13).

Dr. Kalin also added a new diagnosis for "[c]hronic right sciatica and bilateral lumbar radiculopathy with electrodiagnostic evidence consistent with lumbar radiculopathy affecting bilateral L5 nerve roots (02/12/15, EMG NCV bilateral lower extremities) with antalgic gait." (Id.).

Based on these diagnoses, Dr. Kalin reached three conclusions "[w]ithin a reasonable degree of medical certainty." (Id. at 14). First, that Horneland's "preexisting condition due to fractures of the spinous processes of T6, 7, 8, slip and fall injury [in] 1998" was aggravated by prolonged driving. Second, the prolonged driving "caused additional compression extending from the thoracic to the lumbar spine, resulting in further decompensation of the musculoskeletal integrity in the mid/lower back" that resulted in Horneland's lumbar problems, including low back pain and sciatica. (Id.). Finally, he found that Horneland was disabled from working "due to the extensive decompensation of his lumbar spine." (Id.).

Dr. Kalin explained that his diagnoses of Horneland's condition included a combination of the thoracic and lumbar

spine problems. (Kalin Dep. 55:18-21, Doc. # 72-4). He noted that Horneland's condition "has consistently been the lower back where he had initial trauma[.]" (Id. at 64:20-21). He further explained that the original injury at T6, T7, and T8 emanated down to L4 and L5 in the lumbar region because of decompensation of Horneland's spine. (Id. at 72:3-25). Dr. Kalin explained decompensation as:

> you have two sets -- types of muscles, agonist and antagonist muscles, and they balance each other like a tent. When you have an injury, one of those tent stakes is knocked out, and the tent is twisting. The tent is the myofascial areas, okay, and the integrity is just not hanging there the same as it was when the tent was firmly in the ground. When you're sitting there for long periods of time, then if it's twisting, gravity itself, just the forces of gravity and acceleration and changes over time with integration of time and increased force gradually causes this phenomenon which I call decompensation. It doesn't have — in physics, you have to neutralize the forces on each side to balance them. They are not being balanced appropriately on each side. As a consequence, one side is starting to cave in and twist, just because the structure is starting – the building is falling down on its own self.

(Id. at 70:7-25). In essence, Horneland's spine began "falling down" on itself, one vertebra at a time.

Similarly, Horneland himself appeared to link his prior injury to the pain that emerged in 2013. At his initial visit with Dr. Guirguis on November 5, 2014, Horneland stated in a

13

patient information form that his "original" injury occurred in 1998 and that his current pain began in January through April 2013. (Doc. # 77-2 at 45; Trial Tr. at 62:7-13). Consistent with this, Dr. Guirguis recalled in his deposition that Horneland gave a history of both thoracic and low back pain. (Guirguis Dep. 7:6-10, Doc. # 72-3).

Horneland also treated with Dr. Steven Barna at Florida Orthopaedic Institute. (Doc. # 74-49). As he did with Dr. Kalin and Dr. Guirguis, Horneland told Dr. Barna that he suffered from "midback and low back pain" and that his problems began with the original injury in 1998. (Id. at 8). At that appointment, Horneland further related that his back issues were "[g]ood for 10 years [but] bad again starting January 2013," and that the re-appearance of his pain coincided with his increased driving responsibilities at work. (Id.).

In other words, according to Dr. Kalin and Horneland, his disabling condition stemmed from the 1998 injury, and the effect of that injury re-emerged during the look-back period, most likely as a result of Horneland's increased driving responsibilities in the early part of 2013.

Ultimately, Dr. Barna diagnosed Horneland with thoracic

spondylosis. (Id. at 11).   In his deposition, Dr. Kalin described spondylosis as "just a famous word that is difficult to understand. It's basically arthritis." (Kalin Dep. 51:3-13, Doc. # 72-4). Dr. Kalin also noted that a diagnosis of thoracic spondylosis "[v]ery often [] implies that there are degenerative changes in the spine[.]" (Id. at 51:17-18).

Horneland's retained expert for trial, Dr. John Merritt, had a different theory altogether. Dr. Merritt testified that Horneland's disabling diagnoses were inflammatory spondyloarthropathy and bilateral lumbar L5 radiculopathy. (Trial Tr. at 102:1-3). Inflammatory spondyloarthropathy is an auto-immune, inflammatory process disease of the spine. (Id. at 102:6-18). In his deposition, Dr. Merritt explained that spondyloarthropathy is "something that develops over many years." (Merritt Dep. 52:10-12, Doc. # 72-1). "[B]ut then if there is a trigger to it that accelerates the inflammation, that will accelerate the inflammation, which is my scientific theory is that's what happened in this case." (Id. at 52:19-23). The condition is not limited to one area of the spine, rather it is "an autoimmune condition that causes inflammation in the facet joints up and down the spine[.]" (Id. at 51:2-4).

15

Notably, Dr. Merritt opined that Horneland's disease became symptomatic during the December 2012 to July 2013 time frame when his lower back pain increased. (Trial Tr. at 150:19-151:6). Dr. Merritt also agreed that Horneland's lower back pain became constant and began increasing in severity in December 2012. (Id. at 151:23-152:1).

Unlike Dr. Kalin, Dr. Merritt opined that Horneland's disabling condition stemmed from an auto-immune disease. But Dr. Merritt did not examine Horneland, did not speak with Horneland, did not speak with Horneland's treating physicians, was unable to decipher some of Dr. Gelia's records, and did not review Dr. Barna's or Dr. Transfeldt's records. (Id. at 136:9-14, 142:19-143:18, 147:6-7, 149:4-6).

When asked about the possibility that Horneland's condition was related to an auto-immune disorder, Dr. Kalin acknowledged that it could have been a concurrent condition that contributed to Horneland's back pain. (Kalin Dep. 65:1-2, Doc. # 72-4). However, he noted that Horneland's 1998 injury and history of chronic lower back pain led him to believe that his condition was "more mechanically related." (Id. at 64:18-25).

Indeed, the bulk of the evidence in this case supports

16

Dr. Kalin's theory that Horneland suffered from a "mechanical" condition related to his 1998 injury that affected his mid and lower back. Horneland has had problems with his mid and lower back since his 1998 slip-and-fall injury, and he has continually reported the same to his doctors. By contrast, there is little beyond Dr. Merritt's testimony that lends credence to the theory that Horneland's disability was caused by an auto-immune disease. Accordingly, the Court adopts Dr. Kalin's detailed conclusions as to Horneland's condition and rejects the conclusions of Dr. Merritt.

## III. **Conclusions of Law**

The Court has considered the live trial testimony, the deposition transcripts of Dr. Merritt, Dr. Guirguis, Dr. Gelia, and Dr. Kalin, along with the corresponding exhibits, the Administrative Record, and the parties' joint exhibits. With that in mind, the Court makes the following conclusions of law.

The Eleventh Circuit has "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions." Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011). The first

step is to "[a]pply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong[.]'" Id. at 1354.

The administrator's decision is "wrong" if, after reviewing the decision de novo, based on the record before the administrator at the time it made the decision, the Court disagrees with the administrator. Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008). But, "[i]f the court determines that the plan administrator was right, the analysis ends and the decision is affirmed." Id. at 1246-47.

An individual challenging the denial of disability benefits "bears the burden to prove that [he] is disabled." Id. at 1247. However, when a claim is denied on the basis of a specific policy exclusion, the insurer bears the burden to show that the exclusion precludes coverage. Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998) (per curiam).

Under the terms of the policy at issue in this case, "disability" means that

> because of Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are: (a) prevented from

18

> performing at least one of the Material Duties of
> Your Regular Occupation on a part-time or full-time
> basis; and (b) unable to generate Current Earnings
> which exceed 99% of Your Basic Monthly Earnings due
> to that same Injury or Sickness.

(Doc. # 74-2 at 36). As previously noted, the policy's pre-

existing condition exclusion states:

> We will not provide benefits for Disability:
>
> (a) caused by, contributed to by, or resulting from a
> Pre-existing Condition; and
>
> (b) which begins in the first 12 months after
> You are continuously insured under this
> Policy.
>
> A **Pre-existing Condition** means any Injury or
> Sickness for which You received medical
> treatment, advice or consultation, care or
> services including diagnostic measures, or had
> drugs or medicines prescribed or taken in the 3
> months prior to the day You become insured under
> this Policy.

(Doc. # 74-2 at 24). Further, the policy defines "injury"

and "sickness" as follows:

> **Injury** means an accidental bodily injury which is
> the direct result of a sudden, unexpected and
> unintended external force or element, such as a
> blow or fall, that requires treatment by a
> Physician. It must be independent of Sickness or
> any other cause, including, but not limited to,
> complications from medical care. Disability due
> to such injury must begin while You are insured
> under the Policy. Injury does not include
> elective or cosmetic surgery or procedures, or
> complications resulting therefrom.

> **Sickness** means a disease, disorder or condition, including pregnancy, for which you are under the care of a Physician. Disability must begin while you are insured under the Policy. Sickness does not include elective or cosmetic surgery procedures, or complications resulting therefrom.

(Doc. # 74-2 at 37-39).

The evidence shows that, beginning in 2013, Horneland was diagnosed with multiple conditions reflecting degeneration in his lumbar spine. Dr. Gelia diagnosed him with a "backache," "lumbar backache," and "chronic backache" which in medical parlance translated to "lumbosacral sprain/strain, lumbago, lumbar disc disease, and degenerative joint disease." Dr. Kalin diagnosed him with "exacerbation/aggravation [of] chronic thoracolumbar musculoskeletal ligamentous strain with minimal annular bulging L4-5, L5-S1," which he later changed to "[a]ggravation [of] chronic thoracolumbar musculoskeletal ligamentous strain with mild central protrusion T11-12 without canal stenosis or cord compression, mild osseous degenerative change with mild scoliosis, minimal annular bulging L4-5, L5-S1." Finally, Dr. Barna diagnosed him with thoracic spondylosis.

While the Court accepts the diagnosis and conclusions of

Dr. Kalin, the Court also recognizes that Horneland received several other diagnoses related to his back problems. But Horneland's condition, whatever the diagnostic label, involved pain in his thoracic and lumbar spine, beginning in December 2012, for which he sought refills of his pain medication from Dr. Gelia on March 4, 2013. Thus, the various conditions diagnosed by Dr. Gelia, Dr. Barna, and Dr. Kalin all manifested as back pain. See Horneland, 717 F. App'x at 855. ("Self-Reported Symptoms" are "*manifestations of [the policyholder's] condition*" which includes "*pain*" (emphasis in original)).

Stated differently, the evidence here shows that Horneland's condition was a re-aggravation of his 1998 injury that manifested itself as pain in his lumbar and thoracic regions around December 2012. Horneland then sought treatment for that pain when he saw Dr. Gelia to get his prescriptions re-filled on March 4, 2013, during the look-back period, which ran through March 11, 2013. Then, by August 2, 2013, the pain stemming from Horneland's condition had grown severe enough that Horneland was no longer able to work, rendering him disabled under the policy.

Ultimately, then, Horneland's disabling condition,

21

diagnosed by Dr. Kalin as "[a]ggravation [of] chronic thoracolumbar musculoskeletal ligamentous strain with mild central protrusion T11-12 without canal stenosis or cord compression, mild osseous degenerative change with mild scoliosis, minimal annular bulging L4-5, L5-S1," manifested itself as mid and lower back pain for which Horneland sought treatment with Dr. Gelia during the look-back period. Therefore, the Court finds that Horneland's disabling condition is a pre-existing condition within the meaning of the policy.

Because Horneland's disability was caused, contributed to by, and/or resulted from a pre-existing condition within the meaning of the policy, United of Omaha has established that the pre-existing condition exclusion precludes coverage. Thus, United of Omaha correctly denied Horneland's disability claim.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

The Clerk is directed to enter judgment in favor of Defendant United of Omaha Insurance Company and against Plaintiff Kristian Horneland. Thereafter, the Clerk is directed to close this case.

22

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 28th day of August, 2019.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

23